[Civ. No. 19656.   Second Dist., Div. Two.   Nov. 30, 1953.]

ALICE RULE DISNEY, Appellant, v. ALBERT DOUGLAS DISNEY, Respondent.

Patrick James Kirby for Appellant.

Chas. R. Thompson for Respondent.

FOX, J.—Plaintiff and defendant were married in June, 1933, and separated after having lived together for 10 years. Twin boys, Douglas and Jack, were born to this union on June 1, 1935. Plaintiff secured an interlocutory decree of divorce in November, 1944, the parties having previously entered into a property settlement agreement. In accordance with the stipulation of the parties, defendant was ordered to pay $165 per month for plaintiff's support and $100 per month for the maintenance of the two boys plus one half of their dental, medical or hospital expense and to maintain a $15,000 policy on his life for the benefit of the boys during their minority. Custody of the children was awarded plaintiff, with the right of reasonable visitation by their father.

As a result of a hearing in October, 1951, defendant was required to pay $200 per month for the support of each boy. Plaintiff's request for an increase in her alimony was denied. Defendant, however, paid a $500 counsel fee for plaintiff's attorney, and $225 court costs in connection with that proceeding.

On February 20, 1952, defendant, who had remarried and established a new home, secured the issuance of an order to show cause by which he sought to have the original custody order modified so as to award custody of Douglas to him. Plaintiff immediately filed notice of motion for allowance of attorney's fees and costs to resist defendant's application for change of custody, and also procured the issuance of an order to show cause by which she demanded increased alimony and support for the boys in substantially the same amounts that she had sought in the hearing the previous October. All of these matters were heard together early in April, 1952.

At the conclusion of the hearing the court modified the former custody order by awarding custody of Douglas to the father with right of reasonable visitation to the plaintiff and directed that Douglas be enrolled at the Chadwick private school as a day student, commencing April 15th, the father to pay all of his expenses including $50 per month to plaintiff for his support ''for such time as he shall spend during visits with his mother.'' The court also ordered defendant to pay $350 attorney's fees for plaintiff and $1.50 costs in defending the custody proceeding. The court denied plaintiff any increase in alimony or any increase for the maintenance of Jack. The court also denied attorney's fee and costs relative to plaintiff's petition for such additional support. Plaintiff appeals from these orders.

Douglas made an excellent scholastic record at John Burrows Junior High School in Los Angeles. He was also president of the student body, and did well in athletics. In his first semester in Los Angeles High he made a B average; during his second semester, however, he received one B and four C's. In his next semester, which was the first portion of his junior year, he received straight D grades. During this semester he had not been studying, had skipped classes and was out on school nights. The twin brother, Jack, who was attending a different high school, was getting along satisfactorily. Mrs. Disney became concerned about the cause of Douglas' grades slipping and conferred with his high

school advisor as early as November, after Douglas had received a flunk notice in one subject; she also conferred with a specialist in adolescent problems and a number of men connected with private schools. Mr. Disney was also concerned about Douglas' grades and feared he would not be able to enter college. He conferred with the head of the Chadwick School, which is a small accredited, private preparatory school located in the vicinity where he lived, and arranged for Douglas to attend it as a day student, with supervised study for two hours each evening at the school; also, that he attend summer school. This plan contemplated Douglas' living at his father's home, which had ample accommodations. Douglas was interested in and agreeable to this program and wanted to try it, but his mother would not consent. 'It was because of her refusal that the custody proceeding was initiated by Mr. Disney.

Plaintiff's first contention is that the court abused its discretion in awarding custody of Douglas to the father. She particularly insists ''there is no evidence to support the order for change of custody'' and that ''absolutely no change of circumstances relevant to consideration of custody of the child has been shown.'' Her position, however, is not well founded.

''In a contest between parents concerning the custody of their minor child neither is entitled to custody as a matter of right. Under the statute (Civ. Code, § 138(2)) each is equally entitled to custody and no showing or finding of unfitness is necessary to enable the court to award custody to one or the other in accordance with what, in its sound discretion, is deemed the best interest of the child.'' (*Davis* v. *Davis,* 41 Cal.2d 563, 565 [261 P.2d 729].) It is also pointed out in this opinion (p. 565) that ''The court has broad discretion in matters pertaining to the change of custody of children.'' In passing on such question, ''It is the welfare of the child and not the shortcomings of the respective parties which is determinative.'' (*Young* v. *Young,* 117 Cal.App.2d 735, 738 [256 P.2d 1009]; *Clarke* v. *Clarke,* 35 Cal.2d 259, 262 [217 P.2d 401]), and ''the feelings and desires of the contesting parties are not to be considered, except insofar as they affect the best interests of the child.'' (*Taber* v. *Taber,* 209 Cal. 755, 756 [290 P. 36].) In *Munson* v. *Munson,* 27 Cal.2d 659, 666 [166 P.2d 268], the court states that ''It is settled that.'an application for a modification of an award of custody is addressed to the sound legal

discretion of the trial court, and its discretion will not be disturbed on appeal unless the record presents a clear case of an abuse of that discretion.' "

It is, of course, the general rule that to warrant the modification of a custodial order there must be substantial evidence of a change of circumstances after the entry of the original decree. (*Davis* v. *Davis, supra.*) However, it is pointed out, in *Foster* v. *Foster*, 8 Cal.2d 719 [68 P.2d 719], that "the change of circumstances" rule is not an absolutely ironclad rule, and that there might be a case in which, despite the fact that there was apparently no change of circumstances, nevertheless, the welfare of the child might require that the previous order of custody be changed. (P. 728.)

Applying these principles, it is clear the court was amply justified in modifying the custody order. While there is no suggestion of misbehavior on the part of plaintiff, or that she is not deeply interested in the welfare of her boys, the inference is inescapable that she has become ineffective in her supervision and guidance of Douglas. The fact that Douglas skipped classes, did not study, was out on school nights, and that his grades slumped, does not mean that Mrs. Disney was an unfit parent but rather that she was inadequate to meet and solve his problems at that stage of his development. Her difficulty may have been due largely, or perhaps entirely, to the well recognized fact that boys, during their adolescent years, are frequently, for psychological reasons, unable or unwilling to properly evaluate and follow their mother's advice and direction. Plaintiff undoubtedly appreciated this aspect of the situation for she was a consulting psychologist and sought advice from a specialist in adolescent problems and school men who constantly dealt with young boys. But whatever the cause, the stark fact remains that she was not able to provide the effective guidance that Douglas required although she was apparently directing Jack satisfactorily.

Furthermore, the educational future of Douglas was at a crucial point. He is a bright boy with leadership ability and capable of doing college work, but his chance for admission to college was fast disappearing. This is emphasized by the fact that at the end of the first semester of his junior year he had D grades in all subjects. That he was capable of earning college-required grades is demonstrated by his record for the first semester of his sophomore year, when he made a B average. Thus, in two semesters Douglas' school work dropped from college-required standards to near failing.

It should be noted here that plaintiff blames Douglas' drop into the D column on his alleged emotional upset following visits with his father, after the October, 1951, hearing and decision on her petition for more alimony and support for the boys. The first of these visits took place about October 14th. The trial judge said he found "no justification" for her belief. The court indicated Douglas' grades had started down earlier. The school record sustains that conclusion. Although Douglas had received one A, three B's and one C in the first semester of his sophomore year, he only received one B the next semester and four C's. This was a noticeable decline in his grades. This semester covered the period from February, 1951, to June, and was therefore prior to the October hearing.

It is obvious that drastic action was required; a complete change of attitude was necessary and former study habits must be resumed else Douglas could not hope for a college education. To expect this change to take place in an environment where scholastic disaster had been fast approaching and was then near at hand was a vain hope. If Douglas was to have the opportunity for the development which a college education affords, something must be done immediately. A chance to attend an accredited, preparatory school which had small classes, coupled with supervised evening study and followed by summer school, was an educational program that gave reasonable prospect of meeting Douglas' needs and provided for him the school climate in which to do the quality of work he was capable of doing and thus retrieve a fast-fading opportunity for college training. In the light of Douglas' precarious school situation it clearly appears that it was for his best interest and welfare to approve the father's school program and permit Douglas to live in his father's home and thus have adult male supervision and guidance during this important teen-age period. To make this plan effective it was proper to give the father custody so that he would have complete authority in directing Douglas and in supervising the execution of his school program. Thus the custody order finds substantial support in the changed conditions and on the ground that it is for the best interest and welfare of Douglas.

Plaintiff contends she was denied a fair trial. She charges the trial judge prejudged the case and that he was guilty of prejudice against her and her cause.

■ She first complains about certain remarks of the court during the first afternoon session of the trial. The court had examined the file, heard the father's testimony as to Douglas' poor grades and deteriorating scholastic interest and his proposed plan for the boy, and at the suggestion of and upon stipulation of counsel had interviewed Douglas in chambers and reported the substance of that conference, which included the statement that Douglas "would like to try out this plan of his father's, going to Chadwick School and living with his father . . ." At the conclusion of the court's statement, counsel for plaintiff inquired whether the court desired "to hear further testimony about this matter at all," to which the court replied, "Well, I can't think of anything that might be helpful. Of course, I don't know what facts you have, Mr. Kirby." After some further comment the court said: "Now, Mr. Kirby, coming back to your original question. With the facts that we have before us, and assuming the father is a proper person, as I do, and that the mother is a proper person, it does seem to me that it is almost impossible to say No to the proposed change." In response to counsel's statement that plaintiff desired this matter to be "tried out as fully as she is able to present it," the judge replied, "I will hear whatever you have to offer." He then added this admonition: "Let's guard the most important thing, and that is that the boy remains satisfied that whatever his father or mother offer is because they think it is for his best interest, and not because of some selfish reason of their own." To this Mr. Kirky responded: "I regret very much, if the court please, that it is precisely our position that Mr. Disney's offer is not made for the benefit of this boy but for selfish reasons only." The court then observed: "Well, this matter is going to descend from its lofty plane that it has been on, I gather, and I am very sorry to hear that."

The judge's response to the inquiry of plaintiff's counsel, as to his desire to hear any further testimony on the custody and school plan for Douglas, that while he could not think of anything that might be helpful, but "Of course, I don't know what facts you have, Mr. Kirby," clearly does not indicate that the court had prejudged the case or that plaintiff was to be cut off without an opportunity to present her evidence. The clear inference is that plaintiff might have additional facts to offer and that she would be given an

opportunity to present them. The later comment by the judge that "it does seem to me that it is almost impossible to say No to the proposed change" was prefaced by these words, "*With the facts we have before us,* and *assuming* the father is a proper person, as I do, and that the mother is a proper person . . ." (Italics added.) This language shows the judge was only expressing a tentative opinion on the evidence then before him, not knowing, as he had just pointed out to Mr. Kirby, what other facts he might have. The court was entitled to assume that each of the parents was a fit and proper person to have custody of Douglas. This comment affords no basis for saying that the judge was then deciding this aspect of the case or that additional evidence would not be received and considered. When counsel for plaintiff indicated he desired to present further evidence the court replied: "I will hear whatever you have to offer." Whereupon plaintiff was on the witness stand approximately a full court day giving her views on the custody question and school plan for Douglas. Certainly this does not justify a conclusion that the court prejudged the case or was unwilling to hear her evidence. (*Barr* v. *Barr,* 119 Cal.App.2d 588 [259 P.2d 957].)

There is no substance to plaintiff's complaint about the judge's remark that he was sorry "this matter is going to descend from its lofty plane." Up to that point the best interest and welfare of Douglas had been the "lofty plane" upon which the hearing had been conducted, and that was the plane upon which the court had expressed the hope it would be maintained, for that was the primary question to be determined. Such a comment does not indicate bias toward defendant or prejudice against plaintiff.

Plaintiff cites "merely as illustrative of the unfair attitude of Judge Vickers" that he asked her if she had ever seen a psychologist about herself. She apparently attaches great significance to this illustration because in her brief it is italicized. The record on this point is as follows:

"THE COURT: Have you talked to psychologists about yourself and your attitude towards this situation?

"THE WITNESS: I have."

Just what possible unfairness can attach to the asking of that question, particularly in view of the affirmative response, we are totally unable to see.

During the course of the trial the following transpired while Mrs. Disney was on the witness stand:

"THE COURT: You think it is not for their welfare [the

boys] for him [the father] to see them frequently, not to their best welfare?

"THE WITNESS: (Plaintiff.) No; I think it is not, under the circumstances.

"THE COURT: And your reasons for that?

"THE WITNESS: My reasons for that are that I believe that Mr. Disney exerts an influence over the boy through his attitudes, which builds attitudes in Douglas which are not desirable and are emotionally disturbing to him.

"THE COURT: It is very nice to write some article, but here that means nothing, madam. Give us facts. You speak of emotional attitude. What are you referring to?"

Plaintiff cites this comment as illustrative of the unfair attitude of the judge. It will be noted that in the last answer the witness indulged in generalities. The court, perhaps in an inarticulate fashion, was undoubtedly attempting to suggest to plaintiff that while such general statements would be "very nice" in some article she might write, they were not helpful here; that she must give the court facts. Specifically, what was she referring to when she spoke of emotional attitude? We are unable to see any unfairness in the foregoing. Of course, the court wanted facts and not generalities, and was entitled to know what attitudes she considered the father's influence developed in Douglas which were not desirable and emotionally disturbing to him.

Plaintiff testified that the evening following the interview of Douglas by Judge Vickers, the boy told her that he did not know what he was going to tell Judge Vickers until he talked to the judge in chambers and that he was surprised at what he had said. As further illustrative of the court's alleged unfairness, plaintiff makes the following statement with emphasis in her brief: "At this point Judge Vickers sternly *directed the appellant* [plaintiff] *to have no further discussions with the boy Douglas* although the boy was in the legal custody of appellant and living with appellant in their family home." Here again the record will assist in evaluating the fairness of the judge's admonition. It is as follows:

"THE COURT: I would suggest until this proceeding is completed that you have no further discussions with Douglas as to what he should do or why he has done things or made certain decisions. Let the boy from now on come to such conclusions as he can for himself, as far as this proceeding is concerned." This admonition was also made applicable to Mr. Disney. No impropriety as to this admonition to the

parties was then suggested and we can see nothing wrong or unfair about it.

During the cross-examination of Mr. Disney as to conversations he had had with the boys relative to the manner in which Mrs. Disney used the money he was giving for their support, Mr. Disney said: "One of them stated that their mother did not have much money. I said I thought she had an adequate amount of money, both from the standpoint of income and that she had more money in the bank than I did." Then counsel for plaintiff asked this question: "By so stating to the boys, did you intend to convey to them the thought that Mrs. Disney is better situated with reference to this world's goods than you are, Mr. Disney?" Whereupon the court interrupted by saying: "Well, don't answer that question. I don't see any importance to that." The court further said: "Proceed, Mr. Kirby. Let's save a little time. We are going very slowly with this matter, and this part is comparatively simple. It is important, but it is simple." The foregoing is cited as an example of the judge's unfairness. There is no merit whatsoever in this assignment. The question was wholly immaterial and the court was correct in ruling it need not be answered. There was absolutely no impropriety in the court's comment that "We are going very slowly with this matter," and suggesting to counsel that he proceed.

Plaintiff complains of the court's interruption of her counsel's cross-examination of Mr. Disney as to the amount of money he had given the boys personally since the October decision, in an alleged campaign to gain their favor. The court suggested he "roughly estimate" the amount rather than read each item and date from his memorandum book. In response to his expressed inability to do this the court inquired whether it was as much as $50 apiece. The witness replied: "Possibly." The court then asked whether it was more than $25 apiece, to which Mr. Disney replied: "I would think so." The court said, "That is near enough," and directed counsel to proceed. There was no suggestion at the time that any greater detail or more exact amount of such gifts was either necessary or desirable. There was clearly no impropriety on the part of the court in this incident.

Plaintiff mentions a number of other incidents which she asserts show bias and unfairness on the part of the trial judge. To recite and analyze these would unduly extend this opinion. Suffice it to say that we have examined each of them and find nothing to support or justify her charges.

Plaintiff complains because she was denied an increase in alimony and support for the boys. It will be recalled that these questions had been heard and passed upon the previous October. Plaintiff had been denied additional alimony and the support for the boys had been set at $200 each per month. Her petition in the instant proceeding was essentially the same as the previous one. She, of course, was not entitled to retry the October proceeding. She was, therefore, necessarily limited in this aspect of the case to a showing of changed conditions since the October decision which would justify an increase in her allowance. There is simply no basis whatever for increasing the $200 per month for the support of Jack. There is likewise a failure to show any legitimate, increased need on the part of plaintiff. She had a gross income as a consulting psychologist of approximately $5,000 in 1951. Her income for the three months of 1952 prior to the hearing apparently averaged about the same per month. Her net income from her profession seems to have been between $3,000 and $3,500 per year. There does not appear to have been any appreciable change in her professional income between the two hearings.

Plaintiff seeks to justify her claim for additional alimony by two asserted changes in her circumstances since the October decision. These are: (1) that certain of her relatives who had previously voluntarily contributed to her support have since the October decision discontinued such aid; and (2) that her expenses, particularly for rent, have greatly increased. Plaintiff, however, overlooks the fact that in the October hearing the court was advised that her relatives were "unwilling to further continue such aid." Plaintiff so stated in her affidavit in support of her order to show cause. Thus, when the court refused to increase her alimony in October, 1951, it did so in the light of her sworn statement that she would no longer receive aid from her relatives. She therefore cannot claim a change of circumstances in that respect. As to the item of rent, it appears that prior to the October decision plaintiff had been paying $65 per month rent. Immediately thereafter she moved into a different neighborhood and rented a house at $200 per month, plus utilities and inside repairs, and employed a gardener, although the boys were then 16½ years old. The court could have reasonably concluded that such a radical increase in the cost of her living accommodations was unwarranted, and

that this was not a legitimate or necessary change of circumstances.

With the funds available to plaintiff, viz., her professional income, alimony and child support, she is in a position to maintain herself on an economic plane at least equal to (and perhaps better than) that attained either at the time of the separation of the parties or subsequent thereto. The fact that she is receiving less money for child support is offset by the fact that she is no longer financially responsible for the support and maintenance of Douglas, although she receives $50 per month to defray expenses incident to his visits with her.

Although plaintiff was awarded counsel fees for defending the custody proceeding, the court refused to allow attorney's fees and costs for prosecuting her order to show cause for more alimony and child support. In denying attorney's fees for this phase of the proceeding the court pointed out that in this petition plaintiff asked ''almost the identical relief'' she sought the previous October when she was awarded $725 attorney's fees and costs; that there had been no showing of any change of circumstances during the interval which justified her demand; that it was ''more an attempt to retry the very issues which the court had passed upon in the October hearing; that ''the demands should not have been made,'' and that ''they are without justification.'' Without further delineating the record it may reasonably be said that the evidence and the inferences therefrom abundantly justify the court's findings and conclusions. The foregoing, coupled with the further circumstances that plaintiff filed her new demands for more alimony and child support immediately after defendant petitioned for Douglas' custody and approximately only four and one-half months after the October decision, justifies the inference that her action was retaliatory and vexatious in character. ▆▆▆ Since there was no justification for plaintiff's application for more alimony and child support, there can be no obligation in law for defendant to pay her counsel fees and costs incurred in prosecuting the same. (*Parkhurst* v. *Parkhurst*, 118 Cal. 18, 22 [50 P. 9].) But, argues plaintiff, by the property settlement agreement defendant agreed to pay ''all reasonable costs and attorney's fees resulting from any suit or proceeding commenced'' by her to enforce defendant's obligations to support and maintain her and their minor children, hence he must pay her counsel fees and costs incurred in the support proceeding.

■ A contract must be construed in the light of the objects and purposes sought to be attained and to effectuate those objects and purposes if possible. (*Oberwise* v. *Poulos,* 124 Cal.App. 247, 251 [12 P.2d 156].) ■ A fair and reasonable interpretation is always preferred rather than one leading to harsh and unreasonable results. (*Bergin* v. *van der Steen,* 107 Cal.App.2d 8, 14 [236 P.2d 613].)

■ Applying these principles to the unusual situation in the instant matter, plaintiff is not entitled under the property settlement agreement to recover attorney's fees and costs in the support phase of this proceeding for the clear object and purpose of that agreement was to indemnify plaintiff against attorney's fees and costs in any legitimate litigation she might have based on or growing out of it. As previously noted, the issues here involved as to support had been heard and determined only a little more than four months prior to the filing of this petition. By it, plaintiff sought essentially to retry those issues. There had been no substantial change in circumstances. There was no justification for this new application for more alimony and child support, and it had the appearance of being retaliatory and vexatious. To hold that defendant was required under the contract to pay plaintiff's attorney's fees and costs would produce a harsh and unfair result and one that was not within the objects and purposes of the agreement. Such a holding would tend to encourage groundless litigation and to permit the use of the courts for purposes of harassment. This would be contrary to sound public policy.

Plaintiff further complains that defendant was not required to pay the expense of taking his deposition. For the reasons above stated, defendant is not liable for the cost of that portion of the deposition which relates to her petition for more alimony and child support.

This leaves, however, the question of requiring defendant to pay the expense of such portion of the deposition as relates to the custody phase of the proceeding. The court determined there was no necessity for taking such deposition since defendant had advised plaintiff of his plan to have Douglas live at his home and attend the Chadwick School. She was fully aware of the situation with respect to Douglas' grades. She had full opportunity to investigate the Chadwick School and its standing, and to discuss with the head of the school the program for Douglas in the event he was accepted. ■ The court was justified in the circumstances in con-

cluding that there was no necessity to take the deposition. It was, therefore, not an abuse of discretion to refuse to order defendant to pay the expense thereof. (*Stewart* v. *Stewart,* 156 Cal. 651, 655-656 [105 P. 955] ; *State* v. *Superior Court,* 34 Wn.2d 768 [209 P.2d 906, 907].)

The orders are affirmed.

Moore, P. J., and McComb, J., concurred.