[Civ. No. 23877. Second Dist., Div. Two. Aug. 14, 1959.]

FARMERS MUTUAL TELEPHONE ASSOCIATION (a Corporation), Appellant, v. PACIFIC GAS AND ELECTRIC COMPANY (a Corporation) et al., Respondents.

Siemon & Siemon for Appellant.

Richard H. Peterson, Philip A. Crane, Jr., Pillsbury, Madison & Sutro and Baker, Palmer, Wall & Raymond for Respondents.

FOX, P. J.—In this action the parties seek a declaration of their respective rights in a pole line which is used by all three of them. Feeling aggrieved by the judgment, plaintiff has appealed.

In 1909 plaintiff acquired a franchise under the provisions of section 536 of the Civil Code as it then existed to operate a

telephone service in Kern County. It thereupon erected and maintained a pole line, installed telephone wires thereon and operated a rural telephone system. In 1950 defendant Pacific Gas and Electric Company (hereinafter referred to as PG&E) was erecting a pole line in Kern County, a portion of which was to run along the north side of McKee Road between Wibel and Stine Roads where plaintiff had some poles. After some preliminary negotiations, PG&E, which had a franchise to operate in Kern County, offered by letter, dated May 29, 1950, to install a new line of poles where plaintiff had its poles and to grant plaintiff a free contact thereon. The specific proposal was as follows:

"The Pacific Gas and Electric Company is proposing to build a telephone line consisting of a pair of No. 8 copper wires for one mile along the north side of McKee Road from Wibel Road to Stine. Field representatives indicate that the north side of the road is now occupied by a pole lead consisting of eight wires of farmer telephone circuits. It is our understanding that you are connected with the non-profit cooperative organization to whom these wires belong and we are, therefore, writing to you to make a proposal which, we believe, will be to the advantage of you people.

"As we understand it, the existing line is in poor condition. Our normal procedure would be to build a new line of standard construction and make agreements with the other parties envolved to contact the pole line at $.25 per pair, [sic] per pole, per year. However, in this instance, it is our understanding that the association, which you represent, is not in a position to make any financial outlay. We, therefore, propose to rebuild this lead using 30 foot poles and 176 foot spans. This set-up would occupy the top of the pole with the 2-wire bracket circuit and would transfer the eight farmer line wires and crossarms into the third gain position.

"If this arrangement is agreeable with you, the Pacific Gas and Electric Company will prepare a contact agreement in which we will give free contact to the association for the existing wires and we will also undertake to rebuild and transfer your wires and arms to our poles. The pole line itself will be maintained by this company but the maintenance of the wires, arms and attachments in the third gain position will remain the responsibility of you people."

Plaintiff accepted this offer by letter dated June 14, 1950, reading in part as follows:

"In answer to your letter of May 29, regarding a proposed

telephone line, to be built along the McKee road south of Bakersfield.

"I have taken the matter up with the Board of Directors of the Farmers Mutual Telephone Association, and they have all agreed to your proposal, of the P. G. & E. building your line along the north side of McKee road between Wible and Stine roads where we now have our poles, and eight wires. Your line to be constructed of 30 foot poles spaced at 176 foot intervals, with your two wires on top and our eight wires on a cross arm in the third gain position, at no cost to us.

"We have enough cross arms, brackets, and glass insulators for that number of poles. We would appreciate it very much if you would replace the present arms and insulators with the others.

"I am sure that we can work this out to the satisfaction of both of us."

Thereafter PG&E removed plaintiff's poles and erected a new pole line and transferred plaintiff's wires to the new poles. In 1954 PG&E transferred a one-half interest in these poles to defendant Pacific Telephone and Telegraph Company (hereinafter referred to as the Telephone Company) which had a franchise to operate in that territory.

The effect of the exchange of the above-quoted letters is the basis of this suit. The pretrial order stated the controversy as follows:

"It is the position of the plaintiff that the agreement represented by Plaintiff's Exhibits One [letter of May 29, 1950] and Two [letter dated June 14, 1950] had the effect only of granting a license to the defendant Pacific Gas and Electric Company to place two number eight copper wires along the reconstructed pole line, and that the work of reconstructing the pole line was done in consideration of the granting of this license. The plaintiff contends that at all times it remained the owner of the pole line even as reconstructed. The defendant Pacific Gas and Electric Company contends that the effect of the agreement in question was to make it owner of the pole line as reconstructed with a license in the plaintiff to continue to run its telephone lines along the new pole line."

By its judgment the trial court declared that in 1950 PG&E became the owner of "the line of poles" in question; that plaintiff has a license to maintain its wires thereon; and that the Telephone Company owns an undivided one-half interest in said pole line. It is from this judgment that plaintiff appeals.

The question here is: Who is the owner of this line of

poles? Looking at the factual picture here presented in a practical fashion it would appear both reasonable and logical that the party who owned and installed the poles became the owner of the pole line, absent language in the agreement indicating the contrary. Taking the contract into account in its entirety (Civ. Code, § 1641) and giving the language used therein its ordinary meaning (Civ. Code, § 1644), we find substantial support for the trial court's determination that PG&E "became the owner, in 1950, of the line of poles" in controversy pursuant to its agreement with plaintiff. We find nothing in the correspondence that discloses a contrary intention. And, of course, it is the mutual intention of the parties (Civ. Code, § 1636) as disclosed by the writings (Civ. Code, § 1638) that is decisive.

We turn now to examination of specific language employed by the contracting parties in their respective letters. In its letter of May 29, 1950, PG&E stated: ". . . *we* will also undertake to rebuild and transfer *your* wires and arms to *our* poles." (Emphasis added.) In plaintiff's reply of June 14, 1950, to PG&E it is stated that the board of directors of plaintiff ". . . have all agreed to *your* proposal, of the PG&E building *your* line . . . where *we* now have *our* poles and eight wires. *Your* line to be constructed of 30 foot poles . . . with *your* two wires on top and *our* eight wires on a cross arm . . . at no cost to *us*." (Emphasis added.) Here the parties by the use of common, every day language, clearly disclose a mutual understanding, that the new pole line would belong to PG&E.

Consideration of other provisions of the agreement discloses where the ownership of the new poles was to be. In its letter of May 29th PG&E said that it was their normal practice in this type of situation to build a new line and charge other parties $.25 per pole per year to contact the poles. This indicates that PG&E is to own the poles. Otherwise PG&E would be charging the owner for the right of such owner to use its own poles. The reason PG&E in this instance did not charge plaintiff for its contacts on the poles in question is set forth in PG&E's letter of May 29th wherein PG&E stated its understanding that the existing line was in poor condition, and that plaintiff was "not in a position to make any financial outlay."

 It is well settled that a fair and reasonable interpretation of a contract is preferred to one leading to harsh and unreasonable results. (*Disney* v. *Disney*, 121 Cal.App.2d 602, 615 [263 P.2d 865]; Civ. Code, § 1643.) Applica-

tion of this principle to the facts in the instant case lend further support to the interpretation placed on the agreement by the trial court. PG&E, having a franchise to operate in Kern County, had the right to erect its own line of poles along McKee Road whether plaintiff's poles were there or not. Had it done so, there could have been no dispute as to the ownership of the new poles. However, because plaintiff's poles were removed, pursuant to the agreement, and plaintiff given a free contact on the new poles, plaintiff now claims that it owns the new poles. If plaintiff's view be accepted, it would mean that PG&E, although it could have erected and owned the poles under its own franchise, nevertheless agreed to erect the poles in dispute for plaintiff in return for a mere license to string its (PG&E's) wires thereon. The effect of this interpretation of the agreement would be that PG&E would be making a gift of the cost of the poles to plaintiff. Such a result would be neither fair nor reasonable, and finds no support in the language used by the parties.

We therefore conclude that the trial court properly held that PG&E owned "the line of poles" here in question. Since the PG&E owned these poles it had the right as the owner thereof to transfer an undivided one-half interest in said pole lines to the defendant telephone company without plaintiff's consent.

Plaintiff appears to be concerned about one matter that is not involved in this lawsuit, viz., that the judgment somehow or other terminated or disposed of plaintiff's franchise, for plaintiff says in its opening brief that ". . . the judgment is that we [plaintiff] do not now own the franchise . . ." and that ". . . we had a franchise and the physical properties thereon, but now we own no physical properties, have no franchise. . . ." Plaintiff's position in this respect is wholly unwarranted.[1] Neither the findings of fact, conclusions of law, nor the judgment make any mention whatever of plaintiff's franchise. It is therefore apparent that the judgment makes no declaration as to said franchise.

Plaintiff complains that the result of the trial court's decision is to down-grade it to the status of a mere licensee. Even if this be true, plaintiff is in no position to complain for such resulted from its own voluntary agreement.

The judgment is affirmed.

Ashburn, J., and Herndon, J., concurred.

[1] In its reply brief plaintiff concedes that its "franchise still exists in legal contemplation."