[Civ. No. 36972. First Dist., Div. Two. Nov. 30, 1976.]

COUNTY OF MARIN et al., Plaintiffs and Appellants, v.
ASSESSMENT APPEALS BOARD OF MARIN
COUNTY, Defendant and Respondent;
ANTHONY SILVEIRA et al., Real Parties in Interest and Respondents.

**COUNSEL**

Douglas J. Maloney, County Counsel, and John M. Cohan, Deputy County Counsel, for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Ernest P. Goodman, Assistant Attorney General, and Edward P. Hollingshead, Deputy Attorney General, as Amici Curiae on behalf of Plaintiffs and Respondents.

No appearance for Defendant and Respondent.

Bagshaw, Martinelli, Corrigan & Jordan and Leland H. Jordan for Real Parties in Interest and Respondents.

**OPINION**

**KANE, J.**—The appeal at hand concerns the question whether certain agreements executed pursuant to the California Land Conservation Act

of 1965 (Gov. Code,[1] §§ 51200-51295, hereinafter Williamson Act[2]) contain an "enforceable restriction" within the meaning of the Constitution and the statutory provisions enacted pursuant thereto (Cal. Const., art. XXVIII; Rev. & Tax. Code, §§ 421-429; 1969 amendments to the Williamson Act; 18 Cal. Admin. Code, Property Tax, rule 51); and, as a consequence, whether the land defined in the agreements is entitled to preferential tax treatment as agricultural or open space land.

The parties to the lawsuit are appellants County of Marin (County) and its assessor, defendant assessment appeals board (Board), and real parties in interest Anthony and Mary Silveira (hereafter taxpayers). On March 7, 1966, and again on March 6, 1967, the taxpayers and the County entered into land conservation agreements (hereinafter Agreements) covering 6 pieces of real property in excess of 1,000 acres. In accordance with certain provisions of the Williamson Act[3] (§§ 51242-51244), the taxpayers agreed that the land described in the Agreements would not be used for any purpose other than production of agricultural commodities; that the Agreements would be valid for a period of 10 years and would automatically be renewed at the end of each year for an additional 10-year period unless a notice of nonrenewal was given; further, that the restrictions assumed in the Agreements would be binding not only on the parties but also on their heirs, successors and assigns. Also included was a provision that the Agreements could be terminated or canceled only according to sections 51280-51285 of the Williamson Act. The bargained for consideration for these restrictions was the tax benefit to the owners, or as the Agreements put it: "the advantage which will accrue to Owner as a result of any reduction in the assessed value of said property due to the imposition of the limitations on its use contained herein."

Pursuant to the foregoing arrangement, the parcels of real property covered by the Agreements were the subject of preferential tax assessments until the tax year 1971-1972. On January 20, 1971, however, the

[1]Unless otherwise indicated, all references will be made to the California Government Code.

[2]Although the title "Williamson Act" was not adopted until the 1967 amendment of section 51200, for purposes of clarity we have related that title back to the original enactment.

[3]In order to distinguish between the original act enacted in 1965 and its numerous repeals and/or amendments adopted subsequent thereto, differing citations will be used: the original act will be cited by reference to the section number or numbers without qualification, while the amended provisions of the act will be cited as amended section or sections (Am. § or Am. §§).

County requested that in order to be accorded preferential tax assessment the taxpayers consent to a modification of the Agreements which was necessitated by the 1969 amendments to the Williamson Act. When the taxpayers failed to comply with the County's request and declined to execute the proffered revised Agreements, the assessor—instead of terminating or canceling the Agreements in harmony with the Williamson Act and the contractual provisions—denied the preferential tax assessment and determined that the parcels at issue were no longer entitled to be valued as " 'open space.' "

This determination by the assessor resulted in a substantial increase in the assessment of the lands. In pursuit of a remedy, the taxpayers filed an application with the Board, contending that the parcels provided for in the Agreements were entitled to be valued as agricultural lands subject to enforceable restrictions within the meaning of the constitutional and statutory provisions. After a hearing and taking evidence, the Board found for the taxpayers and held that the Agreements were valid and that the parcels at issue were entitled to preferential assessment as agricultural land subject to enforceable restrictions. In accordance therewith, the Board ordered a reduction in the assessment of the properties in dispute. In this action brought by appellants for administrative mandamus and declaratory relief, the trial court upheld the decision of the Board.

Broadly stated, appellants' position on appeal is that the Agreements do not contain enforceable restrictions as set out in the Constitution and interpreted in the statutes and rules, and as a consequence the lands at issue do not qualify for preferential assessment and tax treatment.

Before discussing the issue raised by appellants, we briefly review the constitutional, statutory and regulatory provisions pertaining to the subject matter. At the time here relevant California Constitution, article XXVIII (now art. XIII, § 8), provided that "Notwithstanding any other provision of this constitution, *the Legislature may by law define open space lands and provide that when such lands are subject to enforceable restriction,* as specified by the Legislature, to the use thereof solely for recreation, for the enjoyment of scenic beauty, for the use of natural resources, or for production of food or fiber, *such lands shall be valued for assessment purposes on such basis as the Legislature shall determine to be consistent with such restriction and use.* All assessors shall assess such open space lands on the basis only of such restriction and use, and in the

assessment thereof shall consider no factors other than those specified by the Legislature under the authorization of this section." (Italics added.)

By elaborating on the meaning of the aforecited provisions, Revenue and Taxation Code, section 422, spelled out that "Enforceable restriction" consists of a contract, an agreement, a scenic restriction or an open space easement. Revenue and Taxation Code, section 421, subdivision (c), in turn, clarified that an agreement executed prior to the 1969 amendments to the Williamson Act qualifies as an open space subject to enforceable restriction only if it "taken as a whole, provides restrictions, terms, and conditions which are substantially similar or more restrictive than those required by statute for a contract." A similar definition may be found in Property Tax Rules and Regulations, 18 California Administrative Code, rule 51 (hereinafter Rule 51) issued by the State Board of Equalization.[4]

Appellant's precise claim on appeal is that the Agreements do not fall within the aforestated definition because they do not contain substantially similar or more restrictive terms or conditions than those required by the amended Williamson Act. In support of their argument, appellants refer to section 51295 as amended in 1969, and subdivision (e) of Rule 51, and point out that while under these latter sections only that part of the open space contract is invalidated as relates to the land actually condemned, the Agreements at bar allow the nullification of the *entire* contract if an action in eminent domain is initiated. This, continues appellant, would result in an unjustifiable financial windfall to the taxpayers who, in the event of an eminent domain action, would be relieved from the contractual restrictions in toto without paying any cancellation fee (§ 51283; Am. §§ 51283, 51283.3) or any other compensation even if only a small or miniscule part of the land would be actually taken.

In resolving the issue raised by appellant, we are invited to interpret the provisions contained in the Agreements. The principles concerning the interpretation of contracts are, of course, well settled. ■ Para-

[4]Rule 51 provides, in part, that "*An agreement made pursuant to the Land Conservation Act of 1965* prior to November 10, 1969, qualifies for restricted-use assessment pursuant to sections 423 and 426 of the Revenue and Taxation Code *if, taken as a whole, it provides restrictions, terms, and conditions which are substantially similar to or more restrictive than those which were required by such act for a contract at the time the agreement became effective* or which have subsequently been made less restrictive by the Legislature." (Italics added.)

mount among these rules are the following: *the contract must be construed as a whole and the intention of the parties must be ascertained from the consideration of the entire contract, not some isolated portion* (Civ. Code, § 1641; *Universal Sales Corp. v. Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 760 [128 P.2d 665]; *Stewart Title Co. v. Herbert* (1970) 6 Cal.App.3d 957, 963 [96 Cal.Rptr. 631]); *a contract entered into for the mutual benefit of the parties is to be interpreted so as* to give effect to the main purpose of the contract and *not to defeat the mutual objectives of the parties* (*Heidlebaugh v. Miller* (1954) 126 Cal.App.2d 35, 38 [271 P.2d 557]; *Bradner v. Vasquez* (1951) 102 Cal.App.2d 338, 343-344 [227 P.2d 559]); *language which is inconsistent with the objective of the contract shall be rejected* (Civ. Code, § 1653; *Jackson v. Puget Sound Lumber Co.* (1898) 123 Cal. 97, 100 [55 P. 788]). ■ Also, *where a contract is susceptible of two interpretations, the courts shall give it such a construction as will make it* lawful, operative, definite, reasonable *and capable of being carried into effect* if it can be done without violating the intention of the parties (Civ. Code, §§ 1643, 3541; *Rodriguez v. Barnett* (1959) 52 Cal.2d 154, 160 [338 P.2d 907]; *Dix Box Co. v. Stone* (1966) 244 Cal.App.2d 69, 77 [52 Cal.Rptr. 847]). And last, but not least, *the court shall avoid an interpretation which will make a contract extraordinary, harsh, unjust, inequitable or which would result in absurdity*) Civ. Code, § 1638; *Harris v. Klure* (1962) 205 Cal.App.2d 574, 578 [23 Cal.Rptr. 313]; *Straus v. North Hollywood Hosp., Inc.* (1957) 150 Cal.App.2d 306, 311 [309 P.2d 541]; *Pacific Tel. & Tel. Co. v. City of Lodi* (1943) 58 Cal.App.2d 888, 892 [137 P.2d 847]).

■ We believe, when interpreted in light of the foregoing principles, that the terms and conditions of the Agreements bear out the requisite substantial similarity with the provisions of the Williamson Act and thereby fairly qualify as enforceable restrictions within the meaning of the statutory definition.

In arriving at this conclusion, first we wish to reemphasize that the Agreements include the mandatory restrictive provisions prescribed by sections 51242-51244 of the Williamson Act and rule 51, subdivision (a),[5]

---

[5]In consonance with sections 51242-51244 of the Williamson Act, rule 51, subdivision (a), provides that "*The agreement must contain provisions at least as restrictive as the following*:

"(1) An initial term of years sufficient *to make the agreement effective for ten successive lien dates* and an annual renewal date at which time another year is automatically added to the term unless a notice of nonrenewal is given prior to such date.

"(2) *An exclusion of uses* for the duration of the agreement *other than agricultural uses and compatible uses* as defined by the Land Conservation Act, the agreement, or the

and provide that they may be terminated or canceled only by following the procedure laid down in sections 51280-51285 of the Williamson Act. Secondly, and more importantly, however, the Agreements (with an exception here irrelevant) explicitly incorporate *all* the provisions of the Williamson Act.[6]

It goes without saying that the incorporation of the Williamson Act in the Agreements is of overriding significance with respect to the determination of the controversy at hand. Not only does it obviate appellant's contention that there is no substantial similarity between the statutory scheme and the provisions of the Agreements, but also narrows down the issue before us to a mere interpretation of conflicting clauses of the same agreement.

The apparent conflict referred to by appellants can be found in the eminent domain clauses of the Agreements and the pertinent section of the Williamson Act and its 1969 amendment. While section 51295 of the Williamson Act in 1965 provided that *"When any* permissible *action in eminent domain* for the condemnation of the fee title of any land under contract *is filed or when such land is acquired in lieu of eminent domain* for a public improvement by a public agency or person, *such contract is null and void as to the land actually being condemned or acquired* as of the date the action is filed and thereafter the contract shall not be binding on any party to it"* (italics added), paragraph 3 of the Agreements sets forth that *"In the event that an action in eminent domain* for the condemnation of

---

resolution establishing the agricultural preserve in which the property is located.

"(3) A provision *making the agreement binding upon* and inuring to the benefit of *all successors in interest of the owner."* (Italics added.)

In substantial compliance with the above rules, the pertinent portions of the agreements are set out as follows:

"2. During the term of this agreement *the above described land shall not be used for any purpose, other than the production of agricultural commodities* for commercial purposes. No structures shall be erected upon said land except such structures as may be directly related to and compatible with agricultural use, and residence buildings for such individuals as may be engaged in the management of said land, and their families."

"4. This agreement shall . . . remain in effect for a period of ten (10) years therefrom. *"This agreement shall be automatically renewed* at the end of each year *for an additional ten (10) year period,* unless notice of non-renewal is given as provided in Section 51245 of the California Government Code."

"6. *The within agreement* shall run with the land described herein and *shall be binding upon the heirs, successors and assigns of the parties* hereto." (Italics added.)

[6]Paragraph 1 of the Agreements provides that *"The within agreement is made and entered into pursuant to the California Land Conservation Act of 1965* (Chapter 1443 Statutes 1965) *and is subject to all of the provisions thereof,* except as otherwise provided by Government Code Section 51252." (Italics added.)

any land herein *is* hereafter *filed, the within contract shall be null and void upon the filing of such action* and shall not thereafter be binding on any party hereto." (Italics added.) The visible gap between the contractual and statutory provisions has been further widened by the 1969 amendment to section 51295 of the Williamson Act,[7] which along with rule 51, subdivision (e), set out without equivocation that in case of filing an eminent domain action with respect to open space land the contract or agreement shall be nullified only as to the land actually condemned or acquired or to such other land that is rendered unsuitable for agricultural purposes.[8]

Reading these conflicting clauses together, as we must (Civ. Code, § 1641), and giving them a reasonable interpretation as required by the legal precepts outlined before, the conclusion is inescapable that the disputed provisions of the Agreements must be construed to the effect

[7]The 1969 amendment to the Williamson Act may be properly considered in this contractual dispute, because in a legal sense every year a new agreement is entered into between the parties. As noted earlier, pursuant to an express proviso, the Agreements are automatically *renewed* at the end of each year for an additional 10-year period unless a notice of nonrenewal is given by the parties (see fn. 5, *ante*).

[8]Section 51295 as amended in 1969 puts forth in relevant part that "When any action in eminent domain for the condemnation of the fee title of an entire parcel of land subject to a contract is filed or when such land is acquired in lieu of eminent domain for a public improvement by a public agency or person or whenever there is any such action or acquisition by the federal government or any person, instrumentality or agency acting under authority or power of the federal government, such contract shall be deemed null and void as to the land actually being condemned or so acquired as of the date the action is filed and for the purposes of establishing the value of such land, the contract shall be deemed never to have existed.

"Upon the termination of such a proceeding, the contract shall be null and void for all land actually taken or acquired.

"*When such an action to condemn or acquire less than all of a parcel of land* subject to a contract *is commenced, the contract shall be deemed null and void as to the land actually condemned or acquired and shall be disregarded in the valuation process only as to the land actually being taken,* unless the remaining land subject to contract will be adversely affected by the condemnation, in which case the value of that damage shall be computed without regard to the contract.

"*The land actually taken shall be removed from the contract. Under no circumstances shall land be removed that is not actually taken . . . .*" (italics added).

Subdivision (e) of Rule 51 interpreting section 51295 sets out in relevant portion that "*If an agreement contains a clause relating to* any of *the following subjects, it may do so only under the conditions stated*:

"*(1) A provision nullifying the agreement at* or immediately before *the time an action in eminent domain is filed* or land is acquired in lieu of eminent domain (a) if the fee title, or other interest less than fee which would prevent the land from being used for agricultural or compatible uses, is being condemned and (b) *if the agreement is nullified only as to land actually condemned or acquired* or as to such land and a remaining portion that is rendered unsuitable for agricultural or compatible uses." (Italics added.)

that in case of commencement of an eminent domain action the Agreements are to be terminated and nullified only as to the land actually condemned or acquired.

First, this construction is dictated by the mutual interest of the parties in maintaining the agreed upon restrictions for the entire duration of the agreement. As expressed in the statute, the very purpose of the Williamson Act is to encourage the preservation of the maximum amount of agricultural land as open space (§§ 51220, 51222, 51223) and to allow the removal of restrictions only when the devotion of land for agricultural use is neither necessary nor desirable (§§ 51256, 51280). At the same time the landowner who commits his land to agricultural use for a certain period of time also benefits from the agreement by obtaining the contemplated tax benefit, the agreed upon consideration for the restrictions. Since a contract which serves the mutual interest of the parties must be construed so as to promote rather than defeat the common objectives of the parties, an interpretation which furthers these objectives is preferred and a contrary meaning inconsistent with the essential aim of the contract must be rejected (Civ. Code, § 1653; *Jackson* v. *Puget Sound Lumber Co., supra*).

Secondly, the construction reached by us is mandated on the additional ground that the interpretation so given makes the Agreements operative and capable of being carried into effect without violating the intention of the parties (*Rodriguez* v. *Barnett, Dix Box Co. v. Stone,* both *supra*) while a contrary meaning would not only unreasonably strip the taxpayers of the benefit of their bargain, but also would be violative of the specific provisions of the Williamson Act pertaining to cancellation (cf. §§ 51280-51286; 51247; Am. §§ 51281-51284).

Thirdly, and most emphatically, it is quite obvious that a contrary interpretation would lead to an intolerably harsh, unjust and inequitable result, all in violation of well established principles relating to interpretation of contracts (*Disney* v. *Disney* (1953) 121 Cal.App.2d 602, 615 [263 P.2d 856]; *Smetherham* v. *Laundry Workers' Union* (1941) 44 Cal.App.2d 131, 138 [111 P.2d 948]; *Harris* v. *Klure*; *Straus* v. *North Hollywood Hosp., Inc.,* both *supra*). It takes no vivid imagination to realize that by unilaterally denying the landowners the tax benefit, appellants, in effect, have brought about a situation where the taxpayers have remained *invariably bound by the contractual restrictions while simultaneously deprived of the preferential tax treatment,* the bargained for considera-

tion of the Agreements. It goes without saying that such result would be totally inequitable.

In view of our conclusion, the additional issues raised by the parties need not be discussed.

The judgment is affirmed.

Taylor, P. J., and Rouse, J., concurred.