Filed 10/30/14  MacKinnon v. IMVU CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PETER MacKINNON, JR.,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>IMVU, INC.,<br><br>Defendant and Respondent. | H039236<br>(Santa Clara County<br>Super. Ct. No. 1-11-CV193767) |

Plaintiff Peter MacKinnon, Jr., filed a putative class action lawsuit against defendant IMVU, Inc. (IMVU), a Palo Alto-based company that operates an online social entertainment platform.  MacKinnon alleges IMVU deceived its users regarding audio products they purchased from the company and wrongfully restricted users' ability to play those products after purchase.  In his first amended complaint, MacKinnon asserted claims for violations of various consumer protection statutes, as well as for conversion, breach of contract, and negligent misrepresentation.  The trial court dismissed all of the claims by way of a motion for judgment on the pleadings, granting MacKinnon leave to amend only his claims under the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq. (CLRA)), and the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq. (UCL)).  The court sustained IMVU's demurrer to the second amended complaint, which alleged a breach of the covenant of good faith and fair dealing in addition to CLRA and UCL causes of action.  On appeal from the judgment, MacKinnon maintains the court erred in dismissing his claims.  We reverse the judgment with directions and remand.

**I.   BACKGROUND**

### A.   IMVU

IMVU develops and operates an Internet-based entertainment service known as the instant messaging virtual universe.  Users access the instant messaging virtual universe by way of the IMVU application, a software application available for download on the IMVU Web site.  To download the IMVU application, users must create an IMVU account by providing certain information and clicking the "CREATE IMVU ACCOUNT" button.  Immediately below the "CREATE IMVU ACCOUNT" button is small print stating "[b]y clicking Create IMVU Account you are indicating that you have read and agree to the Terms of Service Agreement and Privacy Policy."  A hyperlink to the Terms of Service Agreement and Privacy Policy also appears.

IMVU users create customized virtual characters, or avatars, which can interact with other users' avatars.  Users can purchase products for their avatars--including clothing, furniture, and pets--using "Credits," which can in turn be purchased using real money.  Users also can purchase audio products, including so-called "trigger music"--audio clips or songs users play by typing the appropriate trigger.  Audio products are created by IMVU users, who submit them for inclusion in IMVU's virtual catalog.  Users may listen to any audio product in full before purchasing it by clicking a "TRY" button.  When a user purchases an audio product using Credits a screen pops up displaying the product and the phrase "You own this."  IMVU's Web site states that purchased inventory is "available to be used whenever you like."

### B.   The Terms of Service Agreement

As noted, users must agree to the Terms of Service Agreement to create an IMVU account.  The Terms of Service Agreement states that its terms "govern your use of the IMVU website located at www.imvu.com (the 'Site') and/or purchase and/or use of our products & services (the 'Products')."  It further provides:  "[t]hese terms are a legal contract between you and IMVU and govern your access to, and use of, the Site as well

2

as any related products. . . . IMVU may make changes to the content offered on this Site, at any time without notice."

Under the heading "General Use Restrictions," the Terms of Service Agreement defines a number of terms. In particular, it defines "Submissions" as "items submitted to the catalog by third party developers." It defines "Materials" as "[c]ertain information, documents, products and services provided on and through this Site, including content, logos, graphics, sounds and images." The agreement explicitly provides that Submissions are not Materials. The agreement also defines "Software" as "certain proprietary software . . . that IMVU allows you to download from the Site." After setting forth these definitions, the "General Use Restrictions" provision provides "you acknowledge that you have no right, title or interest in or to this Site, any Products, Materials or Software."

The Terms of Service Agreement contains a section setting forth "Music Store Terms." That section defines "Digital Content" as "digitized versions of audio recordings, and, as applicable, artwork and other information relating to such audio recordings" purchased via the IMVU music store. The agreement states "[y]ou do not acquire any ownership rights in the Digital Content as a result of downloading Digital Content."

A section of the Terms of Service Agreement entitled "Terms and Conditions of Sale" provides that "all virtual products are non-refundable, except, in our sole and absolute discretion." It further states "[w]hen you purchase items or services on this Site such as Credits, credit bundles, avatar names and try it passes, with cash or monetary equivalent, your purchases are non-refundable." With respect to "any item made by a third-party developer," the agreement provides "IMVU is under no obligation to provide any refund (either in cash or in Credits)" for such items if they are "later removed or altered by the developer or by IMVU." Finally, the provision states that IMVU will not provide refunds for catalog submission items that are removed from "this Site as a result

3

of an intellectual property infringement claim (or Unsuitable for IMVU content as set forth in the Virtual Goods Policy) and/or IMVU disables your use of such an item as set forth in these Terms."

The Terms of Service Agreement's "Currency" provision states that "in-world fictional currencies"--known as "Credits"--"may be purchased with real world currency and can then be exchanged on this Site for limited license right(s) to use a feature of our Product or a virtual product when, as, and if allowed by IMVU and subject to the terms and conditions of these Terms."

Finally, a section entitled "Submissions" states that "any 'virtual products' or other items that you develop and make available on this Site (i.e. catalog content)" constitute "Submission[s]."

### C. *IMVU Limits the Playback Duration of Audio Products*

In September 2008, IMVU issued an announcement ("the September 2008 announcement") informing users that, because of bandwidth issues, "new [audio] products submitted" to the virtual catalog would be "cut down to 20 seconds." IMVU stated that the restriction "will not affect products already in the catalog."

On January 31, 2011, IMVU announced that "[e]ffective today, we are applying the 20 second limit to ALL audio products in the catalog." IMVU further informed users that previously purchased audio products would be subject to the 20-second restriction, and that refunds would be offered only for purchases made on or after December 1, 2010.

### D. *MacKinnon's Use of IMVU*

MacKinnon, a Utah resident, joined IMVU in October 2009. Two or three weeks later, he "came to understand that the playback time of some audio files [was] limited" to 20 seconds. He read the September 2008 announcement "[s]oon thereafter." MacKinnon had spent hundreds of dollars on IMVU credits, which he in turn used to purchase audio products. When buying audio products, MacKinnon first sampled them using the "TRY" button to make "certain that it was full length and had not been limited by IMVU to 20

4

seconds."

### E. First Amended Complaint

MacKinnon filed a seven-count first amended class action complaint against IMVU on June 6, 2011. That complaint asserted causes of action for (1) violation of the CLRA; (2) false advertising (Bus. & Prof. Code, § 17500 et seq.); (3) conversion; (4) breach of contract; (5) misrepresentation; (6) unfair, unlawful, and deceptive trade practices in violation of the UCL; and (7) breach of warranty under the Song-Beverly Consumer Warranty Act (Song-Beverly Act) (Civ. Code, § 1790 et seq.). Each claim was premised on the allegation that IMVU misled users into believing they would be able to play the full-length versions of the audio products they purchased as long as they used IMVU.

### F. IMVU's Successful Motion for Judgment on the Pleadings

IMVU moved for judgment on the pleadings and requested judicial notice of the Terms of Service Agreement, which it argued permitted it to alter the length of audio products, thereby precluding MacKinnon's theory of liability. The trial court took judicial notice of the Terms of Service Agreement pursuant to Evidence Code section 452, subdivision (h). The court also noted that the first amended complaint quoted the Terms of Service Agreement, thereby incorporating the agreement by reference. The court concluded that the Terms of Service Agreement unambiguously allowed IMVU to truncate audio products, such that no reasonable user could be deceived into believing that they would always have unrestricted access to audio products they purchased. Based on that reading of the Terms of Service Agreement, the trial court granted IMVU's motion for judgment on the pleadings as to all causes of action and granted MacKinnon leave to amend only the CLRA and UCL claims.

### G. Second Amended Complaint

MacKinnon filed a three-count second amended class action complaint alleging violations of the CLRA and the UCL as well as a breach of the covenant of good faith

5

and fair dealing.  Again, MacKinnon's claims all relied on the allegation that IMVU misled users into believing that they would be able to utilize the full-length versions of the audio products they purchased as long as they used IMVU.  The second amended complaint alleged that certain provisions of the Terms of Service Agreement are unconscionable.

### H.     IMVU's Successful Demurrer

IMVU demurred to the second amended class action complaint.  In opposition, MacKinnon argued that the Terms of Service Agreement was unconscionable and that IMVU had waived its right to enforce the Terms of Service Agreement.  MacKinnon also noted that the complaint pleaded his interpretation of the Terms of Service Agreement, under which IMVU is not permitted to truncate previously-purchased audio products.

The trial court sustained the demurrer without leave to amend on December 12, 2012.  After rejecting MacKinnon's unconscionability and waiver arguments, the trial court concluded that MacKinnon's misrepresentation theory of liability failed in view of the Terms of Service Agreement provision authorizing IMVU to "make changes to the content offered on [its] Site."  Having concluded that the Terms of Service Agreement authorized IMVU's actions, the court dismissed MacKinnon's breach of the covenant of good faith and fair dealing claim on the reasoning that the implied covenant cannot contradict express contractual terms.

The court entered judgment in IMVU's favor on December 31, 2012.  MacKinnon timely appealed.

## II.     DISCUSSION

### A.     Standard of Review

The same standard of review applies to motions for judgment on the pleadings and to general demurrers.  (*Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1298.)  In both instances, our review is de novo and we exercise our independent judgment as to whether a cause of action has been stated as a matter of law.  (*Moore v.*

6

*Regents of University of California* (1990) 51 Cal.3d 120, 125.) The facts alleged in the pleading are deemed to be true, but contentions, deductions, and conclusions of law are not. (*Hill v. Roll Internat. Corp.* (2011) 195 Cal.App.4th 1295, 1300.) We do not review the validity of the trial court's reasoning, and therefore will affirm its ruling if it was correct on any theory. (*Ibid.*) In addition to the complaint, we also may consider matters subject to judicial notice. (*Ibid.*) Facts that are subject to judicial notice trump contrary allegations in the pleadings. (*Ibid.*)

"Where a demurrer is sustained without leave to amend, [we] must determine whether there is a reasonable probability that the complaint could have been amended to cure the defect; if so, [we] will conclude that the trial court abused its discretion by denying the plaintiff leave to amend. [Citation.] The plaintiff bears the burden of establishing that it could have amended the complaint to cure the defect." (*Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1035.)

### *B. Contract Construction*

The viability of many of MacKinnon's claims turns on the meaning of the Terms of Service Agreement. Accordingly, we begin by construing its relevant provisions and considering their enforceability.

#### *1. Rules of Contract Interpretation*

The interpretation of a contract is a question of law that we review de novo. (*Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1448.) "The fundamental goal of contract[] interpretation is to give effect to the mutual intention of the parties." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264, citing Civ. Code, § 1636.) "[T]he contract must be construed as a whole and the intention of the parties must be ascertained from the consideration of the entire contract, not some isolated portion." (*County of Marin v. Assessment Appeals Bd.* (1976) 64 Cal.App.3d 319, 325, italics removed; see also Civ. Code, § 1641.) The "words of a contract are to be understood in their ordinary and popular sense" (Civ. Code, § 1644), and the parties'

7

intent is ascertained from those words alone if it is "clear and explicit, and does not involve an absurdity." (*Id*., § 1638.)

"[W]here an ambiguous contract is the basis of an action," the court "must accept as correct plaintiff's allegations as to the meaning of the agreement" so long as plaintiff "does not place a clearly erroneous construction upon the provisions of the contract." (*Marina Tenants Assn. v. Deauville Marina Development Co*. (1986) 181 Cal.App.3d 122, 128.) In other words, "a general demurrer to the complaint admits . . . any pleaded meaning to which the instrument is reasonably susceptible." (*Aragon-Haas v. Family Security Ins. Services, Inc*. (1991) 231 Cal.App.3d 232, 239.) Significantly, the rule set forth in *Aragon-Haas* applies only where the contract is ambiguous and the plaintiff's proffered interpretation is reasonable.

### 2. Analysis

It is undisputed that the audio products at issue are Submissions as that term is used in the Terms of Service Agreement. That agreement defines Submissions as "items submitted to the catalog by third party developers" and as "any 'virtual products' or other items that [users] develop and make available on this Site (i.e. catalog content)."

The "Terms and Conditions of Sale" section of the Terms of Service Agreement provides that "all virtual products are non-refundable." Because the Terms of Service Agreement defines Submissions as "virtual products" we construe this provision to mean that purchases of Submissions (including audio products) are nonrefundable.[1]

---

[1] In view of this discussion, we reject as unreasonable MacKinnon's allegation that the entire Terms and Conditions of Sale section of the Terms of Service Agreement is inapplicable to Submissions. MacKinnon also contends that the Terms and Conditions of Sale section is inapposite because it applies only to items purchased on the site, and audio products are purchased through the application. This construction is equally unreasonable for two reasons. First, the Terms and Conditions of Sale provisions discussed above are not explicitly limited to purchases on the site. Second, Submissions are defined as " 'virtual products' or other items that [users] develop and make available on *this Site* (i.e. catalog content)." (Italics added.) Plainly, the Terms of Service (continued)

The Terms and Conditions of Sale further provide that "IMVU is under no obligation to provide any refund (either in cash or in Credits) for any *item made by a third-party developer* . . . that is later removed or altered by the developer or by IMVU." (Italics added.) This provision ("the no-refund provision") applies to Submissions, which--as noted--are defined as "*items submitted to the catalog by third party developers*." (Italics added.)

MacKinnon argues that restricting the playback length of an audio product without removing content from the underlying audio file itself does not constitute "alter[ing]" the product. Courts routinely consult dictionaries to determine the usual and ordinary meaning of a word. (*Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1499.) The American Heritage Dictionary defines "alter" as "[t]o change or make different; modify." (The American Heritage Dict. of the English Language (2014) <http://www.ahdictionary.com> [as of Oct. 30, 2014].) The Oxford English Dictionary defines "alter" as "[t]o make (a person or thing) otherwise or different in some respect; to modify, to change the appearance of." (Oxford English Dict. Online (2014) <http://www.oed.com> [as of Oct. 30, 2014].) Based on these definitions, we construe the term "alter" in the Terms of Service Agreement to mean "change or modify." There can be no doubt that limiting the playback length of an audio product constitutes a change. Whether the underlying file is modified to achieve that change is irrelevant, as the Terms of Service Agreement imposes no restriction on the manner in which the "alter[ation]" is achieved.

In sum, the Terms of Service Agreement unambiguously purports to authorize IMVU to unilaterally remove or change virtual products, including audio products, after

Agreement does not distinguish between the application and site in the manner MacKinnon proposes.

9

users pay for them and without offering any compensation.[2]  Next, we consider whether the no-refund provision is enforceable.

### C.    *Unconscionability*

IMVU maintains that the no-refund provision and the provision allowing it to make "changes" to "content" defeat MacKinnon's claims because they expressly authorize its complained-of conduct--the shortening of audio products.  MacKinnon raises unconscionability both as a defense to those contract-based defenses and as an affirmative claim under the CLRA.[3]  As discussed above, we agree with IMVU that the no-refund provision purports to authorize it to truncated previously-purchased audio products and thus find it unnecessary to consider the "changes" to "content" provision.  Accordingly, we consider MacKinnon's unconscionability argument as to the no-refund provision only.

Unconscionability generally is a legal question we review under the de novo standard.  (*Parada v. Superior Court* (2009) 176 Cal.App.4th 1554, 1567.)  "Unconscionability has procedural and substantive aspects," both of which must be present for a court to refuse to enforce a contract or clause based on unconscionability.  (*Abramson v. Juniper Networks, Inc.* (2004) 115 Cal.App.4th 638, 655 (*Abramson*); *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 (*Armendariz*).)  Courts use a " 'sliding scale' " approach in assessing the two elements, such that "the more substantively oppressive the contract term, the less evidence of

---

[2] IMVU argues, and the trial court found, that the Terms of Service Agreement provision authorizing IMVU to "make changes to the content offered on this Site, at any time without notice" likewise sanctioned IMVU's truncation of audio products.  Because we conclude the more specific no-refund provision grants IMVU that authority, we need not decide whether the more general provision regarding "changes" to "content" does so as well, as the more specific provision takes precedence.  (Code Civ. Proc., § 1859; Civ. Code, § 3534.)

[3] We address the affirmative CLRA claim in part II. E. 2., *post*.

10

procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Ibid.*)

A "claim of unconscionability often cannot be determined merely by examining the face of the contract, but will require inquiry into its [commercial] setting, purpose, and effect." (*Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 926 (*Perdue*); see also Civ. Code, § 1670.5, subd. (b) ["When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination."].)

### a. *Procedural Unconscionability*

Procedural unconscionability concerns the manner in which the contract was negotiated. (*Abramson*, *supra*, 115 Cal.App.4th at p. 656.) "Absent unusual circumstances, evidence that one party has overwhelming bargaining power, drafts the contract, and presents it on a take-it-or-leave-it basis is sufficient to demonstrate procedural unconscionability and require the court to reach the question of substantive unconscionability, even if the other party has market alternatives." (*Lona v. Citibank*, *N.A.* (2011) 202 Cal.App.4th 89, 109.) Each of the foregoing criterion is met here, as IMVU users were presented with the Terms of Service Agreement by drafting-party IMVU without any opportunity to negotiate, nor any bargaining power vis-à-vis the company. Thus, the Terms of Service Agreement is characterized by at least some measure of procedural unconscionability.

As noted, the *degree* of procedural unconscionability present is relevant to the enforceability inquiry. The relevant factors in assessing the level of procedural unconscionability are oppression and surprise. (*Abramson*, *supra*, 115 Cal.App.4th at p. 656.) As to oppression, here, the availability of market alternatives (i.e., other online social gaming platforms) and the nonessential nature of the recreational activity indicate that the degree of oppression is low. (*Lhotka v. Geographic Expeditions*, *Inc.* (2010) 181

11

Cal.App.4th 816, 822-824; *Gentry v. Superior Court* (2007) 42 Cal.4th 443, 470 ["freedom to choose whether or not to enter a contract of adhesion is a factor weighing against a finding of procedural unconscionability"].)  "The component of surprise arises when the challenged terms are 'hidden in a prolix printed form drafted by the party seeking to enforce them.' " (*Abramson*, *supra*, at p. 656.)  The Terms of Service Agreement is a 10-page, single-spaced document.  The provision at issue appears in the Terms and Conditions of Sale section (where one would expect to find provisions related to the purchase of virtual products) and in the same typeface and font size as the majority of the document.[4]  Thus, while the agreement does not draw special attention to the no-refund provision, it is not hidden in fine print.  And "the length of a contract alone does not establish surprise." (*Morris v. Redwood Empire Bancorp* (2005) 128 Cal.App.4th 1305, 1322.)  On the current record, we cannot say the element of surprise is present.  Based on the foregoing, we conclude there is a low degree of procedural unconscionability.

### b.     *Substantive Unconscionability*

"Substantive unconscionability pertains to the fairness of an agreement's actual terms." (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development* (*US*), *LLC* (2012) 55 Cal.4th 223, 246.)  As our Supreme Court recently explained, the unconscionability doctrine "ensures that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as ' " 'overly harsh' " ' [citation], ' "unduly oppressive" ' [citation], ' "so one-sided as to 'shock the conscience' " ' [citation], or 'unfairly one-sided' [citation].  All of these formulations point to the central idea that [substantive] unconscionability doctrine is concerned not with 'a simple old-fashioned bad bargain' [citation], but with terms that are 'unreasonably favorable to the more powerful party' [citation]." (*Sonic-Calabasas A*, *Inc. v. Moreno* (2013) 57 Cal.4th

---

[4] Some provisions, not including the one at issue, are in bold, capital letters.

12

1109, 1145.)  Thus, substantive unconscionability exists where a provision is both "one-sided" and there is no justification for its one-sidedness.  (*Armendariz*, *supra*, 24 Cal.4th at p. 118.)

Here, the question is whether the no-refund provision--which allows IMVU to alter, or even remove entirely, virtual products for which users have paid money--results in "an overly harsh allocation of risks or costs which is not justified by the circumstances under which the contract was made."  (*Carboni v. Arrospide* (1991) 2 Cal.App.4th 76, 83.)  On the current record, we cannot make that determination, which turns on the provision's "commercial setting, purpose, and effect."  (*Perdue*, *supra*, 38 Cal.3d at p. 926; Civ. Code, § 1670.5, subd. (b).)  Accordingly, we conclude the court erred in holding, as a matter of law, that the Terms of Service Agreement is conscionable.

### D.   *Waiver*

MacKinnon raises a second threshold argument as to the enforceability of the Terms of Service Agreement--waiver.  In the second amended class action complaint, MacKinnon alleged that IMVU's conduct constituted a waiver of its right to enforce the Terms of Service Agreement.  MacKinnon has abandoned this argument on appeal by not citing a single case supporting it in either of his appellate briefs.  (*Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1120 ["appellant's failure to present any pertinent or intelligible legal argument in his opening brief constitutes an abandonment of the appeal"].)  Accordingly, we need not address the issue.  (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [" '[E]very brief should contain a legal argument with citation of authorities on the points made.  If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' "].)

Having determined that the no-refund provision may be unconscionable and thus unenforceable, we consider whether we nevertheless can affirm the dismissal of MacKinnon's claims on other grounds.

13

*E.* ***CLRA Claims***

The CLRA prohibits specified "unfair methods of competition and unfair or deceptive acts or practices." (Civ. Code, § 1770, subd. (a).) The second amended complaint alleged that IMVU violated the CLRA by deceiving users into believing that full-length audio products would not be truncated and by including unconscionable provisions in the Terms of Service Agreement.

*1.* ***Deception-based CLRA Claims***

MacKinnon's deception-based CLRA claims are predicated on two allegedly deceptive representations: (1) IMVU's September 2008 announcement that the 20-second restriction "will not affect products already in the catalog" and (2) the message "You own this" that users received after purchasing audio products.[5] The second amended complaint alleged these representations violated CLRA provisions that prohibit "[r]epresenting that goods or services have sponsorship, approval, [or] characteristics . . . which they do not have" (Civ. Code, § 1770, subd. (a)(5)); "[r]epresenting that goods or services are of a particular standard, quality, or grade, . . . if they are of another" (*id.*, subd. (a)(7)); "[a]dvertising goods or services with intent not to sell them as advertised" (*id.*, subd. (a)(9)); and "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law" (*id.*, subd. (a)(14)).

To state a deception-based cause of action under the CLRA, a plaintiff must demonstrate that the defendant engaged in conduct that was likely to mislead or deceive a reasonable consumer. (*Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th

---

[5] The second amended complaint also alleges, in the context of the CLRA cause of action, that IMVU "falsely and deceptively represented that . . . if IMVU . . . altered . . . audio products in its customers' inventories, they would receive full refunds." However, the second amended complaint alleges no such representation and MacKinnon does not discuss this supposed misrepresentation on appeal. Accordingly, we conclude he failed to state a claim based on any such representation.

14

663, 680.)  "Whether a practice is deceptive . . . is generally a question of fact . . . [that] cannot be made on demurrer."  (*Linear Technology Corp. v. Applied Materials, Inc.* (2007) 152 Cal.App.4th 115, 134-135.)  However, "[t]he question whether consumers are likely to be deceived . . . can be decided on a demurrer . . . if the facts alleged in the complaint, and facts judicially noticed, compel the conclusion as a matter of law that consumers are not likely to be deceived."  (*Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 226-227 (*Chapman*).)

To state a CLRA violation, a plaintiff also must allege he or she "suffer[ed] . . . damage as a result of " the alleged violation.  (Civ. Code, § 1780, subd. (a).)  Thus, a plaintiff must plead a causal connection between the defendant's allegedly deceptive representation and the alleged harm.  (*Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1367 (*Durell*).)  "Because 'reliance is the causal mechanism of fraud' [citation], this requires pleading facts showing actual reliance, that is, that the plaintiff suffered economic injury as a result of his or her reliance on the truth and accuracy of the defendant's representations."  (*Chapman*, *supra*, 220 Cal.App.4th at p. 228; *Durell*, *supra*, at p. 1367 [reliance means that plaintiff would have acted differently absent the misrepresentation].)

IMVU contends MacKinnon failed to state a deception-based CLRA claim because--in view of Terms of Service Agreement--no reasonable consumer was likely to be deceived into thinking the audio products could never be truncated.  IMVU further contends that MacKinnon failed to adequately allege reliance.

### a. *McKinnon Adequately Alleged Misleading Representations*

We conclude a trier of fact reasonably could conclude, based on the facts alleged and judicially noticed, that a reasonable consumer was likely to be deceived by the September 2008 announcement and the "You own this" representation into believing that their audio products could not be truncated.

15

As discussed above, the Terms of Service Agreement expressly allows IMVU to alter--including through truncation--audio products without offering users refunds. Regardless of that provision's enforceability (which remains in question), we cannot say as a matter of law that reasonable users were not likely to be misled by the subsequent representations on which MacKinnon relies.[6] A reasonable consumer may have understood those representations to mean that IMVU would not exercise any contractual right to truncate certain audio products postpurchase. (*Diacakis v. Comcast Corp*. (N.D. Cal., Jan. 9, 2012) [2012 U.S. Dist. Lexis 2329, at p. *9] ["various consumer protection claims can be predicated on collateral representations that differ from contractual language"]; *Wang v. Massey Chevrolet* (2002) 97 Cal.App.4th 856, 870 [the CLRA makes "unlawful" "oral promises, representations or agreements which may be inconsistent with the rights, remedies, or obligations set out in a written contract"].) Whether a reasonable consumer who read the Terms of Service Agreement and the representations would have been misled by the latter is a question of fact. (*Chapman*, *supra*, 220 Cal.App.4th at p. 227 [whether a reasonable consumer would be misled by reference to calling plan as " 'unlimited' " was a question of fact, despite fact that contract expressly limited the number of minutes and number of calls allowed under the plan]; *Stickrath v. Globalstar, Inc*. (N.D.Cal. 2007) 527 F.Supp.2d 992, 999 [whether satellite phone subscribers were reasonably likely to be misled by provider's representation that the service works "virtually anywhere," despite language in service agreement providing that the service would be " 'limited by the space technology involved and availability of assigned radio spectrum,' " and that provider would not be

---

[6] IMVU's contention that the September 2008 announcement was true is irrelevant because a perfectly true statement may nevertheless be misleading. (*Day v. AT&T Corp*. (1998) 63 Cal.App.4th 325, 332-333; *Chapman*, *supra*, 220 Cal.App.4th at p. 227 [concluding that plaintiff stated CLRA claim based on allegedly misleading statement without deciding whether the statement was actually false].)

16

liable for service interruptions lasting less than 72 continuous hours was a question of fact].)  Accordingly, the court erred in dismissing MacKinnon's deception-based CLRA claims on the theory that he failed adequately to allege deceptive conduct.

         *b.*        *McKinnon Adequately Alleged Reliance on the September 2008 Announcement*

As discussed above, MacKinnon also was required to plead facts showing that he relied on the truth of the September 2008 announcement and the "You own this" representation in making the decision to purchase full-length audio products.  IMVU maintains that MacKinnon failed to do so.  We agree, but only in part.

With respect to the September 2008 announcement, MacKinnon alleged that he "reviewed" the statement, which he understood to mean "only audio products submitted to the virtual catalog after September 2008 would be 'cut down' to only twenty seconds." He further alleged that, thereafter, he purchased hundreds of dollars worth of full-length audio products, only after making sure the products had not been limited to 20 seconds. MacKinnon also alleged that he would have spent less money on full-length audio products had he known IMVU would later truncate them.  These allegations are sufficient to allege reliance at the pleading stage.  While the second amended complaint did not use any variation of the word "rely," "[o]n appeal from a judgment of dismissal entered upon the sustaining of a demurrer without leave to amend, we must treat the demurrer as admitting all material facts properly pleaded and all reasonable inferences which can be drawn therefrom." (*Bloomberg v. Interinsurance Exchange* (1984) 162 Cal.App.3d 571, 574-575.)  Accordingly, the complaint is adequate if we can reasonably infer from the allegations that MacKinnon relied on the September 2008 announcement.  (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 327 [complaint adequately alleges reliance where "from its allegations one could infer the plaintiff had relied on a defendant's representation"].)  We believe that inference is reasonable here.

17

By contrast, the allegations are insufficient as to the "You own this" representation because MacKinnon does not allege he ever saw that representation. (*Durell*, *supra*, 183 Cal.App.4th at p. 1363 [plaintiff failed to plead reliance where he did not allege reading document or visiting Web site containing the allegedly misleading representations].) MacKinnon is not relieved of the requirement to "plead and prove individualized reliance on specific misrepresentations or false statements," as he claims, because he does not allege "exposure to a long-term advertising campaign" of the sort at issue in *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 328. *In re Tobacco II Cases* stands for the proposition that, where a plaintiff has been exposed to numerous advertisements over a period of decades, the plaintiff is not required to "plead with an *unrealistic degree* of specificity [the] particular advertisements or statements" that he or she relied upon. (*Ibid*., italics added.) MacKinnon does not allege the sort of "decades-long campaign of deceptive advertising" at issue in *In re Tobacco II Cases*. (*Id*. at p. 306.)

In sum, we conclude MacKinnon stated a CLRA deceptive practices claim based on the September 2008 announcement. However, he failed to state a claim based on the "You own this" representation by not pleading reliance. MacKinnon has not carried his burden on appeal of proving there is a reasonable possibility he can cure that defect in the pleading by amendment. (*Blank v*. *Kirwan* (1985) 39 Cal.3d 311, 318.) Indeed, he does not even address potential amendments. Accordingly, he has not shown the trial court abused its discretion in denying him leave to amend the CLRA claim to the extent it is based on the "You own this" representation. (*Total Call Internat*., *Inc*. *v*. *Peerless Ins*. *Co*. (2010) 181 Cal.App.4th 161, 173 [" 'Where the appellant offers no allegations to support the possibility of amendment and no legal authority showing the viability of new causes of action, there is no basis for finding the trial court abused its discretion when it sustained the demurrer without leave to amend.' "].)

### 2. *Unconscionability-based CLRA Claim*

The CLRA permits a consumer to bring an action for damages and injunctive relief based on the insertion of an unconscionable provision in a contract that is intended to result in or which does result in the sale or lease of goods or services to any consumer. (Civ. Code, § 1770, subd. (a)(19).) The second amended complaint alleged that various provisions of the Terms of Service Agreement are unconscionable.

For the reasons discussed above with respect to unconscionability, we conclude the trial court erred in sustaining IMVU's demurrer to MacKinnon's unconscionability-based CLRA claim to the extent it is based on the no-refund provision. MacKinnon premised his unconscionability-based CLRA claim on two other provisions as well: (1) a class action waiver and (2) the provision allowing IMVU to change the "content offered on this Site" and the Terms of Service Agreement at any time. MacKinnon cannot state a claim based on the Terms of Service Agreement's class action waiver because IMVU has not yet sought to enforce that term of the agreement against MacKinnon. Therefore, he has not "suffer[ed] . . . damage as a result of" the alleged violation. (Civ. Code, § 1780, subd. (a); *Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 643 [complaint failed to state CLRA claim where defendant had not sought to enforce any unconscionable term against plaintiffs].) We need not address the provision authorizing IMVU to change the site content. Accepting, for the sake of argument, IMVU's reading of the provision, in the context of this dispute it merely provides the same authority as the no-refund provision. Accordingly, the same unconscionability analysis would apply.

### F. *UCL Claims*

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law (§ 17500 et seq.)]." (Bus. & Prof. Code, § 17200.) The second amended complaint alleged IMVU violated all three prongs of the UCL, but, on appeal, MacKinnon addresses only the "fraud" prong. We follow suit.

"[A] fraudulent business practice is one that is likely to deceive members of the public." (*Morgan v. AT&T Wireless Services, Inc.* (2009) 177 Cal.App.4th 1235, 1255.) Thus, to state a claim under the fraudulent prong of the UCL, a plaintiff must allege facts showing that members of the public are likely to be deceived by defendant's conduct. (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 951.) A plaintiff also must allege facts showing he or she "suffered injury in fact and has lost money or property as a result of" the alleged UCL violation. (Bus. & Prof. Code, § 17204.) To satisfy that requirement, a plaintiff must plead and prove that he or she "suffered economic injury as a result of his or her reliance on the truth and accuracy of the defendant's representations." (*Chapman*, *supra*, 220 Cal.App.4th at p. 228.)

MacKinnon's claim under the fraudulent prong of the UCL is premised on the same allegedly deceptive representations as his deception-based CLRA claims--namely, the September 2008 announcement and the "You own it" representation.[7] IMVU contends that the second amended complaint failed to adequately allege likelihood of deception or reliance. For the reasons discussed in connection with the CLRA, we conclude MacKinnon properly pleaded a UCL fraud prong claim based on the September 2008 announcement only.

---

[7] In addition to these affirmative representations, the second amended complaint alleges IMVU violated the UCL by "failing to inform [him] . . . that the full-length audio products . . . were not immune from playback restrictions." To state a UCL claim based on an omission, a plaintiff must allege a duty to disclose: "Absent a duty to disclose, the failure to do so does not support a claim under the fraudulent prong of the UCL." (*Berryman v. Merit Property Management, Inc.* (2007) 152 Cal.App.4th 1544, 1557.) "This is because a consumer is not 'likely to be deceived' by the omission of a fact that was not required to be disclosed in the first place." (*Buller v. Sutter Health* (2008) 160 Cal.App.4th 981, 987.) The second amended complaint did not allege that IMVU had an affirmative duty to disclose the possibility that audio products might be truncated after purchase. Thus, MacKinnon failed to state a claim based on that alleged omission. He does not even address the omission-based claim on appeal, let alone demonstrate that he could amend the complaint to cure the defect we identify. Accordingly, leave to amend is not warranted.

## G. False Advertising Law Claim

The false advertising law prohibits advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." (Bus. & Prof. Code, § 17500.) Like the CLRA and UCL, the false advertising law requires allegations of deceptive conduct and reliance. Specifically, a plaintiff must allege facts showing defendant's representations were likely to deceive the public and actual reliance on those representations. (*Chapman*, *supra*, 220 Cal.App.4th at pp. 226, 228.)

MacKinnon's false advertising law claim was predicated on the same theory of deception as his deception-based CLRA claim and his UCL fraudulent prong claim. However, the relevant allegations are slightly different, as MacKinnon was not permitted by the trial court to amend his false advertising law claim.

The second amended complaint demonstrates MacKinnon can amend his false advertising law claim to state a cause of action based on the September 2008 announcement. Therefore, we conclude the trial court abused its discretion by denying MacKinnon leave to amend with respect to that representation.

## H. Misrepresentation

The elements of a claim for negligent misrepresentation are " '(1) a misrepresentation of a past or existing material fact, (2) made without reasonable ground for believing it to be true, (3) made with the intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage.' " (*Bock v. Hansen* (2014) 225 Cal.App.4th 215, 231.) "Each element of a fraud count must be pleaded with particularity so as to apprise the defendant of the specific grounds for the charge and enable the court to determine whether there is any basis for the cause of action." (*Chapman*, *supra*, 220 Cal.App.4th at p. 231.) "The specificity requirement means a plaintiff must allege facts showing how, when, where, to whom, and by what means the representations were made." (*West v. JPMorgan Chase*

21

*Bank*, *N.A.* (2013) 214 Cal.App.4th 780, 793.)

MacKinnon's misrepresentation cause of action was based on the September 2008 announcement and the Web site representation that purchased inventory is "available to be used whenever you like." MacKinnon alleged that these statements were untrue, and that IMVU had no reasonable grounds for believing them to be true. With respect to the September 2008 announcement, IMVU argues MacKinnon failed to allege the first and fourth elements of a claim for negligent misrepresentation. According to IMVU, the September 2008 announcement was true at the time it was made and MacKinnon neither alleged justifiable reliance, nor could he in light of the Terms of Service Agreement. As to the "available to be used whenever you like" representation, IMVU argues only lack of reliance. IMVU also contends MacKinnon's fraud allegations lacked the requisite particularity, specifically as to *when* MacKinnon read the representations at issue.

We agree with IMVU that the first amended complaint failed to plead justifiable reliance on either representation, as MacKinnon did not allege that he read the representations, let alone acted upon them. However, the second amended complaint demonstrates MacKinnon can cure his pleading deficiencies with respect to the September 2008 announcement if permitted to amend the negligent misrepresentation claim. In particular, the second amended complaint alleges MacKinnon reviewed the 2008 announcement within the first several weeks of joining IMVU in October 22, 2009. And, as noted above, we can reasonably infer from the allegations that MacKinnon relied on the September 2008 announcement in purchasing full-length audio products.[8] By contrast, MacKinnon has failed to carry his burden to prove he can cure the pleading deficiencies as to the "available to be used whenever you like" representation. The

---

[8] Contrary to IMVU's contention, MacKinnon adequately pleaded the first element by alleging that the September 2008 announcement was false. That is all that is required at this stage.

22

second amended complaint alleges only that he "noticed" that representation at some unspecified time, an allegation that lacks the requisite particularity. And, on appeal, MacKinnon does not propose any possible amendments.

For the foregoing reasons, we conclude the trial court abused its discretion by denying MacKinnon leave to amend the misrepresentation claim with respect to the September 2008 announcement only.

### I. *Conversion*

"To establish a conversion, plaintiff must establish an actual interference with his ownership or right of possession." (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 610.) To do so, the plaintiff must have "either ownership and the right of possession or actual possession [of the property] at the time of the alleged conversion thereof." (*General Motors A. Corp. v. Dallas* (1926) 198 Cal. 365, 370.)

The first amended complaint alleged MacKinnon had property rights in the audio products he purchased from IMVU and that IMVU converted those products by truncating them. IMVU argues that the Terms of Service Agreement establishes that IMVU users have no ownership interest in audio products. IMVU relies on two contractual provisions: (1) the portion of the "General Use Restrictions" section stating "you acknowledge that you have no right, title or interest in or to this Site, any Products, Materials or Software"; and (2) the provision under the heading "Currency" providing "Credits" "can . . . be exchanged on this Site for limited license right(s) to use a feature of our Product or a virtual product when, as, and if allowed by IMVU and subject to the terms and conditions of these Terms."

The first provision has no application to the audio products at issue. Audio products are virtual products created by third party users, and are referred to as "Submissions" in the Terms of Service Agreement. By its terms, the "General Use Restrictions" provision applies only to the "Site" or "any Products, Materials or Software." "Submissions" are not synonymous with the Site itself. Nor do Submissions

23

fall within the definition of "Software"--"certain proprietary software . . . that IMVU allows you to download from the Site."  And the Terms of Service Agreement expressly provides that "Materials do not include Submissions."  Therefore, the first provision applies to Submissions only if they constitute "Products."  The agreement defines "Products" as "*our* products & services," (italics added) whereas Submissions are " 'virtual products' or other items that [*users*] develop and make available on this Site (i.e. catalog content)."  (Italics added.)  The Terms of Service Agreement--particularly, the Currency provision set forth above--distinguishes between "our Product[s]" and "virtual product[s]."  Accordingly, we conclude that Submissions are not Products, such that the first provision is inapplicable.

The Currency provision indicates that users obtain only "limited license right(s)" to audio products.  The scope of those license rights, and whether they include any ownership interest, is not clear from the Terms of Service Agreement.  While MacKinnon may not be able to establish that the rights he obtained include an ownership interest, he adequately has pleaded such an interest as required to state a claim for conversion.  The court erred in dismissing the conversion claim on the pleadings.[9]

### J.    Breach of Contract

"A cause of action for damages for breach of contract is comprised of the following elements:  (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."

---

[9] In granting IMVU judgment on the pleadings on the conversion claim, the trial court relied on a provision in the Terms of Service Agreement related to the IMVU music store, which states "[y]ou do not acquire any ownership rights in the Digital Content as a result of downloading Digital Content."  The Terms of Service Agreement defines "Digital Content" as "digitized versions of audio recordings, and, as applicable, artwork and other information relating to such audio recordings" purchased via the IMVU music store.  The audio products at issue here were not purchased via the IMVU music store, but from the IMVU virtual catalog.  Accordingly, provisions regarding "Digital Content" and the music store are inapplicable.

(*Careau & Co. v. Security Pacific Business Credit, Inc*. (1990) 222 Cal.App.3d 1371, 1388.) The first amended complaint alleged that, following the September 2008 announcement, IMVU offered full-length audio products for purchase and that MacKinnon accepted that offer by purchasing such products. The complaint further alleged that IMVU breached the resulting contract by truncating the audio products, thereby damaging MacKinnon.

IMVU maintains MacKinnon failed to state a breach of contract claim because the Terms of Service Agreement permits truncation of audio products. But MacKinnon's claim is not premised on the Terms of Service Agreement itself, but on an alleged subsequent contract. To the extent IMVU's argument is based on the parol evidence rule it fails, as "[t]he parol evidence rule . . . does not relate to *future* agreements and does not bar extrinsic evidence that proves that the parties *subsequently* modified their *integrated* writing." (*Beggerly v. Gbur* (1980) 112 Cal.App.3d 180, 188.)

Construed liberally, the first amended complaint alleges that the parties implicitly modified the Terms of Service Agreement by their conduct, and that the modified agreement barred the truncation of audio products postsale. (*Wagner v. Glendale Adventist Medical Center* (1989) 216 Cal.App.3d 1379, 1388 ["A subsequent modification to a written contract may be implied when the parties' conduct is inconsistent with the written contract so as to warrant the conclusion that the parties intended to modify the terms of their agreement."].) Therefore, the breach of contract claim should have withstood the motion for judgment on the pleadings.

### *K*. *Breach of Warranty*

To state a cause of action for breach of express warranty under the Song-Beverly Act, a plaintiff must plead the following elements: (1) the defendant provided a written warranty, or a sample or model of the good to be purchased by plaintiff; (2) the warranty was breached; (3) the product was presented to the defendant for repair; (4) the defendant did not repair the defect or nonconformity after a reasonable number of repair attempts

25

and despite a reasonable opportunity to do so; and (5) the defendant did not replace the good or reimburse the plaintiff an amount of money equal to the purchase price less the value of its use by plaintiff before the defect was discovered. (See Civ. Code, § 1791.2; *Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785, 798-799; BAJI No. 3200.)

MacKinnon asserted IMVU breached two express warranties. First, he alleged that the "TRY" button constituted a sample of the audio product to be purchased, thereby giving rise to an express warranty. Second, he alleged the September 2008 announcement constituted a written warranty that the audio products would not be truncated.

IMVU maintains MacKinnon cannot state a Song-Beverly Act claim because he did not purchase the audio products in California. We agree. The California Supreme Court held in *Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 493, that the Song-Beverly Act applies "only if the goods were purchased in California." MacKinnon alleges he purchased the audio products over the Internet and that he resides in Utah. Because MacKinnon does not allege any purchase in California, his Song-Beverly Act claim fails as a matter of law. (See *Anunziato v. eMachines, Inc.* (C.D.Cal. 2005) 402 F.Supp.2d 1133, 1142 [resident of Massachusetts who purchased consumer good at issue over the Internet could not state a Song-Beverly Act claim].)

### L.    *Breach of the Covenant of Good Faith and Fair Dealing*

Implied in every contract is a covenant of good faith and fair dealing " 'that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.' " (*Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 400.) The elements necessary to establish a breach of the covenant of good faith and fair dealing are: "(1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the

plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." (*Rosenfeld v. JPMorgan Chase Bank, N.A.* (N.D.Cal. 2010) 732 F.Supp.2d 952, 968; BAJI No. 325.)

MacKinnon alleged IMVU breached the covenant of good faith and fair dealing that is implied in the Terms of Service Agreement by "selling . . . products with the intent to unilaterally rescind those sales without refund" and "retroactively change or modify the terms and conditions applicable to those sales." IMVU urges that MacKinnon failed to state a claim because the Terms of Service Agreement expressly authorizes the conduct MacKinnon says violates the covenant--namely, truncating audio products.

The no-refund provision of the Terms of Service Agreement (if enforceable) grants IMVU the discretionary power to alter or remove audio products. " '[W]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing.' " (*Perdue, supra*, 38 Cal.3d at p. 923.) However, " 'courts are not at liberty to imply a covenant directly at odds with a contract's express grant of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement.' " (*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.* (2002) 100 Cal.App.4th 44, 57.) Put differently, the covenant prohibits conduct that is "contrary to the contract's purposes and the parties' legitimate expectations." (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373.)

As we have construed the Terms of Service Agreement, and the no-refund provision in particular, it gives IMVU unfettered authority to truncate audio products without refunding users. Accordingly, if the no-refund provision is enforceable, then " 'no covenant of good faith and fair dealing can be implied which forbids' " that conduct. (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc., supra*, 2 Cal.4th at p. 374.) But given MacKinnon's allegation that the no-refund provision is

unconscionable and unenforceable, he has stated a claim for breach of the covenant of good faith and fair dealing.

## III.    DISPOSITION

The judgment of dismissal is reversed and the cause is remanded to the superior court with directions to vacate its orders granting IMVU's motion for judgment on the pleadings and sustaining IMVU's demurrer to the second amended complaint without leave to amend.  The superior court is further directed to enter a new order (1) denying the motion for judgment on the pleadings as to the conversion and breach of contract claims; (2) granting the motion for judgment on the pleadings as to the false advertising law claim with leave to amend as to the September 2008 announcement only; (3) granting the motion for judgment on the pleadings as to the misrepresentation cause of action with leave to amend as to the September 2008 announcement only; (4) granting the motion for judgment on the pleadings as to the breach of warranty cause of action without leave to amend; (5) overruling the demurrer as to the deception-based CLRA and UCL claims to the extent they are based on the September 2008 announcement; (6) overruling the demurrer as to the unconscionability-based CLRA claim, except to the extent it is premised on the class action waiver; and (7) overruling the demurrer as to the breach of covenant of good faith and fair dealing claim.

The parties shall bear their own costs on appeal.

_____
                    Premo, J.

WE CONCUR:


_____
         Rushing, P.J.


_____
         Elia, J.